IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

WENDY MARIE PITTMAN,

                      Plaintiff,                Case No. 3:13 CV 1776

   -vs-

                                              <u>MEMORANDUM   OPINION</u>

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.

KATZ, J.

       Wendy Marie Pittman applied for social security disability insurance benefits with the Social Security Administration. After exhausting her available administrative remedies, the Commissioner of Social Security subsequently denied Ms. Pittman's application for benefits.

       Ms. Pittman then sought judicial review of the Commissioner's decision. The case was referred to Magistrate Judge James R. Knepp II for findings of facts, conclusions of law, and recommendations. The Magistrate Judge issued a report recommending that the Court affirm the Commissioner's decision denying Ms. Pittman's application for benefits. This matter is before the Court pursuant to Ms. Pittman's timely objections to the Magistrate Judge's report.

       The Court has jurisdiction over the Commissioner's final decision denying Ms. Pittman's request for benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832 (6th Cir. 2006). In accordance with *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001), this Court has made a de novo determination of the Magistrate Judge's report. For the reasons stated below, the Court adopts the report and affirms the Commissioner's denial of benefits.

**I.  Standard of Review**

This Court conducts a de novo review of those portions of the Magistrate Judge's report to which Ms. Pittman objects. 28 U.S.C. § 636(b)(1). In so doing, this Court reviews the Commissioner's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g). This Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Court does not re-weigh the evidence, but must affirm the Commissioner's findings as long as there is substantial evidence to support those findings, even if this Court would have decided the matter differently, and even if there is substantial evidence supporting the claimant's position. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citations and internal quotation marks omitted). The Commissioner's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Id*. at 854–55.

## II. Discussion

Ms. Pittman has not objected, with the exception of some minor points which will be discussed later in this opinion, to the Magistrate Judge's factual summary of the case as set forth on pages one through eleven of the report. Therefore, the Court adopts the Magistrate Judge's summary of the facts. The Magistrate Judge's summary of the case is as follows:

**PROCEDURAL BACKGROUND**

2

In December 2009, Plaintiff filed an application for DIB, alleging a disability onset date of March 16, 2008,[1] due to rheumatoid arthritis and fibromyalgia. (Tr. 153-60, 193). Her claim was denied initially (Tr. 82-85) and on reconsideration (Tr. 90-91). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 97). Plaintiff, represented by counsel, a vocational expert (VE), and a medical expert testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 21, 42). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. On August 14, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### Personal Background, Testimony, and Disability Reports

Born July 25, 1967, Plaintiff was 44 years old at the ALJ hearing and lived in a house with her husband and adult daughter. (Tr. 47). She has an associate's degree in architecture and prior work experience as technical support for a software design company, office manager, and administrative assistant. (Tr. 48, 178). She stopped working because her most recent position was eliminated and collected unemployment benefits for six months, acknowledging she held herself out as being capable of employment. (Tr. 49, 60-62).

Reading from a prepared statement at the ALJ hearing, Plaintiff said she primarily cannot work because of unpredictable pain. (Tr. 50). Concerning daily activities, Plaintiff could attend to light housework with breaks but spent most of the day watching television, reading, and reading emails or viewing message boards on the internet. (Tr. 54, 58, 233, 235). She also took a water aerobics class two times a week throughout the relevant period, went to a fibromyalgia support group once a week, and could drive, but claimed she did so rarely. (Tr. 49, 56, 235-36, 270-72). Plaintiff shopped for light groceries or meals once or twice a week but indicated her husband did the shopping most of the time. (Tr. 235). Plaintiff testified her anxiety and depression "usually stay[ed] pretty even" but there were times when it worsened. (Tr. 65).

### Physical Medical Evidence

In May 2008, Plaintiff saw orthopedic specialist Martin C. Skie, M.D., with complaints of bilateral wrist pain. (Tr. 435). A physical examination revealed full range of motion bilaterally with minimal tenderness. (Tr. 435). Dr. Skie noted diagnostic images were unremarkable, diagnosed mid-carpal instability, prescribed Naprosyn, and recommended isometric strengthening exercises. (Tr. 435).

In November 2008, Plaintiff sought treatment at Digestive Healthcare Consultants to undergo liver testing because she wanted take Methotrexate for rheumatoid arthritis. (Tr. 389). A liver biopsy showed some liver abnormality but no fibrosis. (Tr. 377-78). On examination, she had a normal gait and no joint swelling or

---

1. Plaintiff amended her onset date at the administrative hearing. (Tr. 46).

erythema. (Tr. 391). In December 2008, rheumatologist Michael A. Gordon, M.D., said he thought Plaintiff's pain was "due to a combination of inflammatory arthritis and fibromyalgia." (Tr. 550).

Plaintiff returned to Dr. Gordon in January 2009 and reported "[n]o major problems or flare ups." (Tr. 398). She did complain of left shoulder, left elbow, and wrist and hand pain, and morning stiffness that lasted less than 30 minutes. (Tr. 398). On examination, Plaintiff had tenderness but normal range of motion in her hands, wrists, and fingers; no tenderness and normal range of motion in her elbows; impingement signs in her left shoulder but normal range of motion and strength in both her left and right shoulders; and full range of motion and no tenderness in her hips, knees, and feet. (Tr. 399-400). Dr. Gordon found Plaintiff had moderately severe myofascial pain with 12/18 ACR defined tender points. (Tr. 400).

On February 20, 2009, Plaintiff followed up with Dr. Gordon for inflammatory arthritis and fibromyalgia. (Tr. 401). Plaintiff continued to have problems with her left shoulder but said the pain was "somewhat better", and she thought her medication (Methotrexate) was starting to work. (Tr. 401). She still reported pain with range of motion but less pain and stiffness in her ankles and feet. (Tr. 401). Her physical examination mirrored her prior examination. (Tr. 402-03). Dr. Gordon recommended physical therapy but Plaintiff said she could not afford it. (Tr. 403). Dr. Gordon then instructed her on shoulder exercises to perform at home. (Tr. 403).

An MRI of Plaintiff's left shoulder in March 2009 showed mild impingement but no evidence of joint effusion, rotator cuff tear, or abnormal fluid collection. (Tr. 426). In April 2009, Plaintiff saw Dr. Gordon and reported continued problems with her left shoulder and hands but said her wrist pain was better. (Tr. 405). On examination, Plaintiff's left shoulder was irritable but the remainder of the examination revealed findings similar to her prior examinations. (Tr. 406-07).

In April 2009, Plaintiff's family practitioner Kirk R. Davis, D.O., treated Plaintiff with a corticosteroid injection in her left shoulder. (Tr. 401). Dr. Davis recommended a bone scan, which was unremarkable, in May 2009. (Tr. 424). Plaintiff returned to Dr. Davis in June 2009 and reported shoulder pain. (Tr. 421). Plaintiff had limited range of motion in her shoulders but no atrophy. (Tr. 422). Dr. Davis concluded Plaintiff's shoulder pain did not warrant surgery and he recommended physical therapy and conservative treatment. (Tr. 423).

On June 5, 2009, Plaintiff saw Tauseef G. Syed, M.D. at the Arthritis Center for a second opinion concerning a long history of problems with her wrists. (Tr. 440). A physical examination revealed a normal gait; tenderness in her hands and wrists but normal range of motion; no tenderness and normal range of motion her elbows; no effusion, normal muscle strength, significant tenderness, and decreased range of motion in her left shoulder; no effusion, some tenderness, normal muscle strength, and slightly decreased range of motion in her right shoulder; and full range of motion without pain but some tenderness in her hips, knees, feet, and ankles. (Tr. 441-42). Dr. Syed noted Plaintiff had tenderness all over and stated she had "possible FMS [fibromyalgia]." (Tr. 442). He recommended regular sustained exercise for at least 30 minutes, three to four times per week. (Tr. 442). June 2009 x-rays revealed generally

4

normal findings but dorsal calcaneal spurs in her ankles and severe hallux deformity (bunions) in her feet. (Tr. 410-413).

Plaintiff returned to Dr. Syed in November 2009, requested an injection, and told Dr. Syed she was applying for disability. (Tr. 436). Dr. Syed reported, "I don't think she has sig. arthritis symptoms" and further noted "?secondary gain". (Tr. 437). A December 2009 MRI of Plaintiff's right shoulder revealed a "mild amount of increased signal intensity", a partial undersurface tear of the subscapularis, and a small subcorcoid bursal fluid collection. (Tr. 449).

On November 24, 2009, Plaintiff underwent a functional capacity evaluation administered by physical therapist Melanie Navarre, P.T. (Tr. 660). Ms. Navarre found Plaintiff was capable of "sedentary-light" work. (Tr. 660).

In January 2010, Plaintiff saw Porche Beetham, D.O., for chronic pain. (Tr. 527). Plaintiff reported Cymbalta worked for her depression but not her pain, and a left shoulder injection "much improved her pain" but now her right shoulder bothered her. (Tr. 527). Plaintiff was "slightly tearful throughout her exam when mentioning disability due to the chronic pain." (Tr. 527). Dr. Syed diagnosed fibromyalgia, chronic pain, and insomnia; adjusted and prescribed medication; and advised her to follow up at Cleveland Clinic for a third opinion. (Tr. 527).

In January 2010, Plaintiff saw Bjoern Buehring, M.D., at the Cleveland Clinic for joint and skin pain. (Tr. 578). On examination, Plaintiff had twelve soft tissue tender points; normal muscle and motor strength; no tenderness and full range of motion in her spine; normal inspection of joints in her upper and lower extremities with no effusion, soft tissue swelling, or deformity, and normal range of motion. (Tr. 580). Dr. Buehring thought her symptoms indicated "a component of fibromyalgia" but wanted further testing for possible infectious, autoimmune, or neoplastic etiology. (Tr. 582). He encouraged exercise and noted her fatigue and depression "seemed to be controlled." (Tr. 582). Plaintiff's MRI showed no evidence of disease or synovitis. (Tr. 573). Dr. Buehring called Plaintiff and informed her "that the likelihood of an underlying systemic autoimmune disease [was] low[.]" (Tr. 573). Dr. Buehring said he did not believe her arthritis was due to a rheumatologic disease and recommended evaluation for an infectious disease. (Tr. 573).

Plaintiff followed-up with Dr. Beetham on February 16, 2010, for fibromyalgia and depression. (Tr. 647). Dr. Beetham noted Plaintiff's x-rays and MRIs showed only osteoarthritis in her thumbs. (Tr. 647, 654-55). Plaintiff reported continued pain symptoms and decreased range of motion due to pain. (Tr. 647). Concerning depression, Plaintiff said she was "doing okay" but she had been tearful and foggy in the last six months. (Tr. 647). On examination, Plaintiff exhibited tenderness and decreased range of motion in her left shoulder but good range of motion with external and internal rotation. (Tr. 647). Dr. Beetham changed or continued Plaintiff's medications and recommended physical therapy. (Tr. 647). Plaintiff wanted to stop taking OxyContin, so Dr. Beetham recommended a slow taper and continued Flerxeril for muscle pain. (Tr. 647).

On March 29, 2010, state agency physician Dmitri Teague, M.D., reviewed Plaintiff's medical evidence and assessed her residual functional capacity. (Tr. 325-

5

32). Dr. Teague found Plaintiff could lift/carry 20 pounds occasionally and ten pounds frequently; stand, walk, or sit for six hours out of an eight-hour workday; occasionally climb ramps or stairs; occasionally kneel, crouch, or crawl; and balance frequently. (Tr. 626-27, 629). He also found she should avoid hazardous heights or unprotected scaffolds. (*Id*.). Plaintiff was unlimited with respect to gross and fine manipulation but limited to occasional overhead reaching or lifting with her arms. (Tr. 628). Dr. Teague cited medical evidence throughout Plaintiff's relevant period to support his findings and also noted that as of 2010, doctors believed Plaintiff suffered from fibromyalgia rather than rheumatoid arthritis. (Tr. 626-27). Dr. Teague's assessment was affirmed as written by W. Jerry McCloud, M.D., in August 2010. (Tr. 767).

On May 3, 2010, Dr. Beetham completed a "Fibromyalgia [RFC] Questionnaire" and listed Plaintiff's diagnosis of right shoulder impingement, irritable bowel syndrome (IBS), recurrent UTI, depression, and anxiety. (Tr. 692). He noted Plaintiff met the criteria for fibromyalgia and her prognosis was stable. (Tr. 692). Dr. Beetham declined to opine on Plaintiff's functional limitations with respect to lifting, carrying, reaching, handling, fingering, twisting, bending, stooping, crouching, crawling, or climbing, and did not indicate whether Plaintiff would be absent from work due to her impairments. (Tr. 692-93). However, he did write "see FCT results"; but it is unclear these results were attached.[2] (Tr. 694). He found Plaintiff would be restricted by heavy work and irregular flares of pain. (Tr. 694). He believed Plaintiff could walk two to four blocks without rest or severe pain; sit for 30 minutes at a time; and stand/walk for 30 minutes at a time. (Tr. 694).

Plaintiff followed up with Dr. Beetham in September and November of 2010, and reported continued but worse left thumb pain, left foot pain, and diffuse muscle aches. (Tr. 799, 806). Dr. Beetham adjusted her medication, indicated her foot pain was the result of bunions, and recommended she see a different rheumatologist. (Tr. 799, 806).

On December 10, 2010, Plaintiff saw David K. Vallance, M.D., P.C., for further evaluation. (Tr. 770). Plaintiff reported her pain was "6 out of 10", and due to widespread pain, she was diagnosed with fibromyalgia. (Tr. 770). On examination, Plaintiff had joint tenderness and muscle hypertonicity. (Tr. 771). He diagnosed connective tissue disease, uncontrolled; fibromyalgia; migraine headaches; and hypogammaglobulinemia. (Tr. 771-72). He believed Plaintiff met the criteria for "SLE" or systemic lupus erythematosus (lupus) and recommended rechecking inflammatory markers. (Tr. 772). In January 2011, Dr. Vallance diagnosed Plaintiff with lupus. (Tr. 775). He said, "[t]he combination of [lupus] and [fibromyalgia] are currently disabling, preventing her from engaging in any regular employment." (Tr. 775). Dr. Vallance echoed this sentiment at follow up visits in February 2011, July 2011, and September 2011. (Tr. 779, 859, 876). However, in January 2011, Dr. Vallance also stated Plaintiff's lupus was "fortunately not a severe variety." (Tr. 787).

---

2. Plaintiff asserts Dr. Beetham is referencing Ms. Navarre's evaluation which indicated Plaintiff could perform sedentary-light work; however, after reviewing the record, there is no evidence linking Ms. Navarre's evaluation is the "FCT" Dr. Beetham references. (*Compare* Tr. 660 *with* Tr. 694).

6

In September 2011, blood tests results were "consistent with moderate lupus activity." (Tr. 861).

Plaintiff returned to Dr. Beetham in January 2011, and reported her lupus diagnosis. (Tr. 797). Plaintiff said Prednisone helped her joint pain but fibromyalgia pain was still present; however, "overall she [was] doing well." (Tr. 797). Dr. Beetham noted Plaintiff's depression, anxiety, and fibromyalgia were under control. (Tr. 797).

Following the ALJ's unfavorable decision in December 2011, Plaintiff called Dr. Syed's office and claimed her disability claim was denied "based on [his] note that suggested [Plaintiff was] trying to get secondary gain??" (Tr. 437, 937). In a handwritten note dated January 19, 2012, Dr. Syed explained that when a patient has more symptoms than objective signs on physical examination, he questions the possibility of secondary gain, such as disability benefits. (Tr. 937).

Plaintiff's counsel also requested an opinion from Dr. Vallance after the issuance of the ALJ's decision as to whether Plaintiff had symptoms to qualify for listing 14.02 (lupus). (Tr. 935-36). In a check-the-box form, Dr. Vallance indicated Plaintiff had symptoms of fatigue, fever, malaise, and weight loss under listing 14.02. (Tr. 935-36). Plaintiff submitted this evidence to the Appeals Council. (Tr. 6).

**Mental Medical Evidence**

In April 2009, Plaintiff reported to Dr. Beetham that her depression was stable and panic attacks were rare – she felt both were under control. (Tr. 530).

On March 9, 2010, Plaintiff saw Dr. James Tanley, Ph.D., for a consultive psychological examination. (Tr. 606-08). Plaintiff "cried during the examination" and reported feelings of worthlessness because she could not contribute financially. (Tr. 607). Plaintiff was cooperative and showed no evidence of unusual thought content. (Tr. 607). She was alert, oriented, had intact memory, and high average intelligence. (Tr. 607). Concerning daily activity, Plaintiff reported watching television, letting the dogs in and out, doing light housework, and playing computer games. (Tr. 607-08). Dr. Tanley assessed a global assessment functioning (GAF) score of 60 for symptom severity, and functional GAF score of 80.[3] (Tr. 608). He found she was mildly impaired in her ability to relate to others; had no impairment with respect to understanding and following instructions, maintaining attention to perform simple tasks; and a moderate impairment in her ability to withstand stress and pressure of daily work due to sleep disturbance and feelings of worthlessness. (Tr. 608). Dr. Tanley diagnosed adjustment disorder with depressed mood. (Tr. 608).

In January 2010, Plaintiff told Dr. Beetham Cymbalta was working for her

---

3. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). The rating has two components: symptom severity or the social and occupational level of functioning. *Id.* at 32-33. A GAF rating of 60 for symptom severity indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks." *Id.* at 34. A functional GAF rating of 80 indicates no more than a slight impairment in occupational functioning. *Id.*

depression but not her pain. (Tr. 527). In February 2010, Plaintiff reported she was "doing okay" but was stressed out over pain and her disability application. (Tr. 647).

In March 2010, state agency psychologist Marianne Collins, Ph.D., prepared a psychiatric review technique and assessed Plaintiff as having a non-severe mental impairment. (Tr. 611-24). As support, Dr. Collins cited Dr. Tanley's report and noted the file as a whole indicated only mild symptoms in stress tolerance. (Tr. 623). In August 2010, state agency psychologist Melanie Bergsten, Ph.D., also assessed Plaintiff has having a non-severe mental impairment. (Tr. 753-65). Dr. Bergsten also stressed Plaintiff had only a mild impairment in stress tolerance, noting normal mental findings and independent activities of daily living. (Tr. 765).

In January 2011, Dr. Beetham noted Plaintiff's depression, anxiety, and fibromyalgia were under control. (Tr. 797). Plaintiff denied depression, had been "doing activities with her family", and "seem[ed] fairly happy". (Tr. 797).

Plaintiff began treatment with therapist Sandra Elliot, L.P.C.C., in September 2010 and had monthly sessions through September 2011. (Tr. 842-55). Her symptoms were depression and anxiety related to her health issues. (Tr. 842-55). In April 2011, Ms. Elliot sent a letter to Plaintiff's counsel stating that Plaintiff's medical diagnoses had been devastating and she was trying to cope as best she could. (Tr. 838). Ms. Elliot diagnosed Plaintiff with adjustment reaction with physical symptoms and major depression. (Tr. 838).

## ALJ Decision

On December 16, 2011, the ALJ found Plaintiff had the severe impairments of bilateral shoulder tendinopathy, depression, systemic lupus erythematosus, and fibromyalgia but they did not meet or medically equal a listed impairment. (Tr. 26-28). The ALJ then found Plaintiff had the residual functional capacity (RFC) to perform sedentary work with the following limitations: stand/walk for up to ten minutes at one time and for up to two hours (with normal breaks) during an eight-hour workday; sit for up to six hours (with normal breaks) during an eight-hour workday; occasionally reach overhead bilaterally; frequently engage in gross manipulation bilaterally; avoid all hazards due to medication side effects; avoid concentrated exposure to vibration; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, kneel, stoop, crouch, and crawl; and perform unskilled work. (Tr. 28-29).

Based on VE testimony, the ALJ found Plaintiff could perform work as an information clerk, general office clerk, or assembly work at a bench or table; thus she was not disabled. (Tr. 37).

### III. PITTMAN'S ARGUMENTS

Ms. Pittman contends that the Magistrate Judge: 1) "failed to see an obvious inconsistency where the ALJ criticized a medical source for relying on outdated medical opinions and then

8

relied on the same evidence herself;" 2) "erred in finding that it was legally permissible for the ALJ to reject the opinions of a nonacceptable medical source following for that reason;" 3) "did not properly characterize the ALJ's findings as to mental limitations she found necessary but then omitted from her RFC assessment;" and 4) "erred in disregarding the ALJ's clear error in her credibility analysis."

Ms. Pittman argues that in rejecting the opinion of Dr. Teague, the ALJ wrote, "This opinion was given less weight because Dr. Teague did not have the opportunity to review the records that were received after March 2010. The later evidence demonstrated more severe limitations." Ms. Pittman states that the Magistrate Judge dismissed her argument as "counterintuitive" where the ALJ rejected Dr. Teague's opinions and applied more severe limitations.

The ALJ was simply explaining why she found Ms. Pittman could only perform the more restrictive requirements of sedentary work, rather than the much more demanding requirements of light work. Dr. Teague's opinion was based upon the evidence which existed at the time of his review. The ALJ had the opportunity to review all the evidence, including the evidence which existed *after* Dr. Teague reviewed the record. Because there is no question that Dr. Teague could not have reviewed records created after his review date and that Ms. Pittman's condition had deteriorated from when Dr. Teague evaluated the evidence, the ALJ's remarks are supported by substantial evidence.

Ms. Pittman also objects to the ALJ's rejection of Dr. Vallance's opinion regarding Ms. Pittman's lupus. Dr. Vallance felt that Ms. Pittman's lupus and fibromyalgia prevented her from engaging in any regular employment. The ALJ noted that Ms. Pittman's ability to engage in

regular employment is a question reserved for the Commissioner, giving the opinion "little weight." (Tr. 31). The question of an individual's ability to work is the prerogative of the Commissioner and not a physician. 20 C.F.R. § 404.1527(d); *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 727 (6th Cir. 2014). Furthermore, the ALJ explained that Dr. Vallance's opinion was not a specific assessment of the nature and severity of Ms. Pittman's impairments.

Ms. Pittman asserts that the Magistrate Judge erred in characterizing her lupus as "not severe." (Doc. No. 13, p. 3). However, the ALJ specifically noted that Dr. Vallance found Ms. Pittman's "variety of lupus was not severe." (TR. 31, 787). Thus, the Magistrate Judge's characterization of Ms. Pittman's lupus is consistent with Dr. Vallance's opinion. The Court finds the Commissioner's decision regarding this argument is supported by substantial evidence.

Ms. Pittman states that the ALJ and Magistrate Judge treated a statement by Dr. Beetham that her point pains were "controlled" as the equivalent of the condition being "resolved." (Doc. No. 13, p. 3). Ms. Pittman is simply arguing over semantics. Dr. Beetham remarked that Ms. Pittman was feeling better as a result of being put on a prednisone burst, which helped her joint pain. Dr. Beetham stated the pain was "controlled." (Tr. 797). The Magistrate Judge used the word "resolved" instead of the word "controlled" to describe Ms. Pittman's pain. Black's Law Dictionary defines "resolve" as "[t]o find an acceptable or even satisfactory way of dealing with (a problem or difficulty)." Black's Law Dictionary 1504 (10th ed. 2014). The word "control" is defined, in part, as "[t]o regulate." Black's Law Dictionary 402 (10th ed. 2014). As the dictionary establishes, both "control" and "resolve" have nearly identical definitions. The Magistrate Judge's use of the word "resolved" in his report, instead of the word "controlled," was not erroneous.

Ms. Pittman next argues that the ALJ erred in rejecting the opinions of her treating mental health counsel because she was not an "acceptable medical source" as defined by 20 C.F.R. § 1502.  The Magistrate Judge noted that the ALJ's rejection was appropriate, citing 20 C.F.R. §§ 404.1502 and 404.1527.  Ms. Pittman asserts that this is incorrect.

The opinion in question is from Ms. Sandra Elliott.  (Tr. 838).  Ms. Elliott's credentials is that of a licensed professional clinical counselor.  On April 6, 2011, Ms. Elliott stated that Ms. Pittman's debilitating health "was a major concern causing her anxiety and depression."  Ms. Elliott reported that Ms. Pittman's diagnoses of lupus and fibromyalgia have "been devastating for her."  (Tr. 838).  Ms. Elliott noted Ms. Pittman was "trying hard to cope with this as best she can."  Ms. Elliott stated Ms. Pittman was diagnosed with adjustment reaction with physical symptoms and major depression.  (Tr. 838).

Under § 404.1527(a)(2), medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a patient's] impairment(s), including [ ] symptoms, diagnosis and prognosis, what [a patient] can still do despite impairment(s), and [ ] physical or mental restrictions."  *See also Moore v. Comm'r of Soc. Sec.*, No. 13-6654, 2014 WL 3843791, at *3 (6th Cir. Aug. 5, 2014).  Although Ms. Elliott is not deemed an "acceptable medical source," *see Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011), the debate is irrelevant because her brief letter does not meet the standard of a medical opinion.  *Moore*, 2014 WL 3843791, at *3.  The Court notes that Ms. Elliott also submitted numerous treatment session notes consisting mostly of checked boxes.  (Tr. 842–55).  These notes also fail to meet the definition of a medical opinion.  *Id.*  Accordingly, the ALJ did not commit a legal error in deciding to give Ms. Elliott's opinion "no weight."  (Tr. 32).

Ms. Pittman asserts that the Magistrate Judge misconstrued her argument regarding the impact her mental condition had on her residual functional capacity assessment.  In her brief before the Court, Ms. Pittman stated that the ALJ included the impact of her mental impairments solely with respect to a limitation to unskilled work.  (Doc. No. 9, p. 19).  She states that the ALJ "simply ignores [her] moderate limitations as to handling stress and pressure on the job."  (Doc. No. 9, p. 19).

Ms. Pittman states the Magistrate Judge erred in concluding "that plaintiff was arguing that the ALJ did not have the obligation to adopt every limitation imposed by a doctor, even where adopting some of them."  (Doc. No. 13, p. 6).  Ms. Pittman emphasizes that this was not her argument.  Rather, "she only argued for the inclusion of a limitation that *had been adopted.*  By failing to grasp this fact, the Magistrate Judge has effectively re-cast plaintiff's argument."  (Doc. No. 13, pp. 6–7).

After the ALJ made her specific findings regarding Ms. Pittman's residual functional capacity to perform sedentary work with multiple restrictions (Tr. 28–29), the ALJ specifically explained in great detail Ms. Pittman's mental impairments.  (Tr. 31).  The ALJ listed Ms. Pittman's mental impairments, along with the supporting medical evidence.  (Tr. 31).  The ALJ explained that Ms. Pittman could perform unskilled work despite her depression.  (Tr. 31).  Contrary to Ms. Pittman's position, the ALJ did not ignore her mental impairments.  She explicitly states "[i]n terms of the claimant's depression, the undersigned found the claimant could perform unskilled work."  (Tr. 31).  The ALJ's explanation is sufficient to establish that she considered Ms. Pittman's depression when reaching her residual functional capacity assessment.  *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).     In her final objection,

Ms. Pittman states that the Magistrate Judge erred in disregarding the "clear error" committed in the ALJ's credibility analysis. The ALJ determined that Ms. Pittman's testimony regarding her conditions was not fully credible because it did not align with the medical evidence. (Tr. 33). Credibility determinations regarding an applicant's subjective complaints rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). In assessing an individual's credibility, the ALJ must first determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(a); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). The ALJ found that Ms. Pittman had such an impairment. Next, the ALJ must evaluate the intensity, persistence, and functional limitations of the symptoms by considering objective medical evidence, as well as other factors found in 20 C.F.R. § 404.1529(c). *See, e.g., Rogers*, 486 F.3d at 247.

  The ALJ's credibility determination is supported by substantial evidence. The ALJ found numerous inconsistencies that called into question the reliability of Ms. Pittman's testimony. The ALJ found that despite her complaints, Ms. Pittman failed to mention several problems to her doctors. (Tr. 33). For example, Ms. Pittman testified that she required quick and ready access to a restroom due to her alleged irritable bowel syndrome. She also testified she suffered from noticeable hand tremors that affected her ability to eat. Ms. Pittman reported she spent days in bed due to pain that no medication could relieve, pain which was so bad she was unable to do her housework or care for herself. Ms. Pittman reported her lupus was "out of control" and the chemistry in her brain impacted her pain receptors. (Tr. 33).

The ALJ found no evidence that Ms. Pittman ever complained of these problems to her doctors. The ALJ stated Ms. Pittman received treatment for her allegedly disabling impairments. The treatment was essentially routine and/or conservative in nature. Ms. Pittman was never a candidate for surgery and her lupus was described as mild. Her treatment consisted of prescribed physical therapy, injections, and medications. The ALJ reported that Ms. Pittman was able to take walks with her husband, while her depression and anxiety were controlled. (Tr. 33). For these reasons, the ALJ held that Ms. Pittman's "statements went against the claimant's credibility in general." (Tr. 33). Because the ALJ provided a thorough explanation regarding her credibility determination in light of the medical evidence in the record, the Court concludes that the ALJ's decision is supported by substantial evidence as to this issue. *Jones*, 336 F.3d at 476.

Ms. Pittman objects to the Magistrate Judge's reference to a document which she presented to the Appeals Council. The issue concerns a comment in Dr. Syed's notes from November 2009, indicating that he suspected that Ms. Pittman was engaging in secondary gain behaviors. (Tr. 33). The note in question states: "? Secondary gain," while the remaining portions of the note are mostly illegible. (Tr. 437). The Magistrate Judge noted that the record contained a subsequent letter by Dr. Syed describing what he meant by the comment. (Tr. 937). Ms. Pittman objects to the Magistrate Judge's reliance on the letter because the letter was not presented to the ALJ, but to the Appeals Council. Ms. Pittman argues that the explanation can only be considered in light of a remand request, citing *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).

The Court has carefully reviewed the Magistrate Judge's report on this point and finds that the Magistrate Judge was not influenced by the letter. The Magistrate Judge simple noted the existence of the report in the record. The Magistrate Judge's analysis of the issue was on the "?

Secondary gain" remark and how it was legally permissible for the ALJ to consider the comment along with the other evidence in the record. The Magistrate Judge explained the numerous sources the ALJ replied upon to reach her disability determination. The Magistrate Judge's analysis on this issue was correct.

### IV. Conclusion

Accordingly, the Magistrate Judge's report and recommendation is adopted and the Commissioner's denial of Ms. Pittman's application for social security disability insurance benefits is affirmed.

IT IS SO ORDERED.

    s/ *David A. Katz*
    DAVID A. KATZ
    U. S. DISTRICT JUDGE